815 F.2d 81
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, for the use and benefit of
Hartline-Thomas, Inc., Plaintiff-Appellant,
v.
ALGERNON BLAIR, INC., a Delaware corporation, and United
States Fidelity and Guaranty Company of Baltimore,
Maryland, Defendants-Appellees.
 No. 86-5019.
 United States Court of Appeals, Sixth Circuit.
 Feb. 18, 1987.
 
 Before KENNEDY, JONES and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Hartline-Thomas, Inc. ("Hartline-Thomas" or "the subcontractor") appeals the judgment entered in favor of defendant Algernon Blair, Inc. ("Algernon Blair" or "the general contractor"). Hartline-Thomas filed an action against Algernon Blair pursuant to the Miller Act, 40 U.S.C. 9 270a, and arising out of the construction of an army hospital in Ft. Campbell, Kentucky. Hartline-Thomas claimed that Algernon Blair breached the subcontract between the parties by fating to make adequate progress payments, by delaying in submitting Hartline-Thomas' proposal concerning a change order issued by the government, and by supplementing Hartline-Thomas' Labor force and using its equipment. Algernon Blair counterclaimed that Hartline-Thomas breached the subcontract by withdrawing from the project. The District Court for the Middle District of Tennessee directed a verdict in favor of Algernon Blair. For the reasons stated, we affirm.
 
 
 2
 Algernon Blair was the general contractor in charge of the construction of the Colonel Blanchefield Community Hospital, in Ft. CampbeU, Kentuckv. Algernon Blair contracted with Hartline-Thomas to perform painting and wall-covering work as required by the general contract for an original subcontract price of $286,000. Hartline-Thomas began work under the subcontract in the spring of 1979.
 
 
 3
 Pursuant to the general contract and the subcontract, the general contractor and the subcontractors were paid monthly on the basis of the percentage of work completed during the prior month. Hartline-Thomas generally submitted its monthly application for payment on or around the 25th of each month. The payment requested was often an amount agreed upon by the subcontractor's representatives, Algernon Blair's office manager, and Algernon Blair's project superintendents, in a monthly review session. After the monthly meetings, Algernon Blair would meet with the government in order to arrive at a percentage of completion acceptable to both Algernon Blair and the government.[1] Algernon Blair usually received a check for the total amount of work completed on the project in the prior month approximately three weeks after meeting with the government. It then paid its subcontractors within seven days of receipt of the government check. The subcontract provided that the general contractor was not required to pay the subcontractor until it had received payment from the government.
 
 
 4
 In March of 1980, the government issued a change order request, Change Order Request Number FC-7-99-257 ("Change Order 257"), which affected the work of several subcontractors.[2] Regarding Hartline-Thomas' work, the order involved changing the third coat of interior paint for certain areas from latex to semi-gloss enamel. In a letter dated May 26, 1980, Hartline-Thomas proposed that its price be increased by $54,292.00. On June 17, the government directed Algernon Blair to proceed with the work required by Change Order 257. Algernon Blair passed this directive on to HartlineThomas by letter dated June 24, 1980. The government eventually supplemented its original change order, and Hartline-Thomas then indicated by letter that its original proposal should be decreased by $150.00. Algernon Blair submitted Hartline-Thomas' total price proposal to the government on January 19, 1981, together with the price proposals of all other affected subcontractors.
 
 
 5
 Algernon Blair and the government began negotiations relating to Change Order 257 in February of 1981, and Mr. Human, the Vice-President of Hartline-Thomas, participated in these discussions on behalf of Hartline-Thomas. The government had not completed its review of Algernon Blair's proposal as of February 27,1981. Regarding Hartline-Thomas' proposal, the government continued to refuse an increase of ten cents per square foot of semi-gloss enamel. Hartline-Thomas notified Algernon Blair for the first time on February 27, 1981., that it would reduce its workforce to the number needed to proceed under the original subcontract if its subcontract price was not adjusted according to its proposal by March 6, 1981. In response, Algernon Blair warned Hartline-Thomas that its proposed conduct would constitute a breach of the subcontract.
 
 
 6
 On March 6, 1981, Hartline-Thomas reduced the number of painters it had working on the project to two and discontinued all work relating to Change Order 257. The work that these two painters could have accomplished would not have been sufficient to maintain the progress of work required by the project schedule. On March to,
 
 
 7
 Algernon Blair informed Hartline-Thomas that it would begin to supplement the work force of Hartline-Thomas on March 16 if Hartline-Thomas had not returned its crew to the project. Algernon Blair and Hartline-Thomas met again with the government representatives on March 12, 1981, to further negotiate regarding Hartline-Thomas' requested increase. By this time, the government had agreed to pay an additional eight cents per square foot of paint. Hartline-Thomas, however, refused to accept less than ten cents. On March T7, 1981, Algernon Blair began to supplement Hartline-Thomas' work force. Hartline-Thomas then withdrew from the project completely and Algernon Blair took over Hartline-Thomas' equipment and continued with the necessary work. The subcontract was eventually completed by a subsidiary of Algernon Blair for a cost greater than the adjusted price of the Hartline-Thomas subcontract. Hartline-Thomas filed its complaint in District Court on May 24, 1981. It alleged that Algernon Blair had breached the subcontract because it failed to make adequate monthly progress payments and failed to pay Hartline-Thomas for its materials. Algernon Blair filed a counterclaim on August 17, 1981, on behalf of itself and its surety, and brought in Hartline-Thomas' surety as an additional counterclaim defendant. On August 20, 1982, Algernon Blair filed a motion for partial summary judgment. The motion was denied on March 7, 1983. The case went to trial on May 14, 1983, but resulted in a mistrial. The trial from which Hartline-Thomas appeals concluded on April 18, 1985.
 
 
 8
 Prior to trial, Algernon Blair requested that the Court reconsider the earlier denial of its motion for partial summary judgment. The motion was again denied. At the close of Hartline-Thomas' proof, though, the District Court directed a verdict in favor of Algernon Blair on all issues relating to Change Order 257. At the close of all of the proof, Algernon Blair moved for a directed verdict as to all remaining issues, namely whether Hartline-Thomas had received adequate progress payments and whether the subcontractor had breached the subcontract when it terminated work on the project. For the sake of judicial economy, the District Court reserved its ruling on the motion and submitted the case to the jury. The jury found, in the form of special interrogatories, that Algernon Blair had not failed to make monthly progress payments to Hartline-Thomas, nor had the termination of performance by Hartline-Thomas constituted a material breach of the subcontract.
 
 
 9
 Algernon Blair moved the Court to direct the verdict, or in the alternative, to grant a judgment notwithstanding the verdict, with respect to the issue of Hartline-Thomas' termination of performance. On August 26, 1985, the Court granted Algernon Blair's motion for a directed verdict on that issue. Hartline-Thomas appeals the judgment in favor of Algernon Blair.
 
 
 10
 Hartline-Thomas claims that Algernon Blair breached the subcontract by delaying in submitting Hartline-Thomas' proposal relating to Change Order 257 and by not making progress payments based on the additional materials and Labor costs arising from the different work required. The District Court directed a verdict in favor of Algernon Blair as to all issues relating to the change order, finding that:
 
 
 11
 the handling of any dispute with regard to change order work was expressly a matter of agreement between the parties and governed by Article IV of the subcontract which makes any dispute between the parties concerning such change order work to be a matter of resolution by the appeals and disputes provision of the prime contract commanding the subcontractor to go forward with the change order work regardless of whether there is a dispute between the prime and the subcontractors with the view in mind of accomplishing the work and resolve the disputes at a later time.
 
 
 12
 Joint Appendix at 29. We affirm the District Court's decision. Hartline-Thomas took no steps to resolve its dispute regarding the change order through the appropriate appeals procedure. When the government refused to grant in its entirety the increase proposed by Hartline-Thomas, Hartline-Thomas notified Algernon Blair that it would reduce the number of painters working on the project. The language of the subcontract is explicit and the meaning of Article rV is clear. Hartline-Thomas was required bv the subcontract to continue performance and to resolve its dispute through the established dispute mechanism. The subcontractor has no claim against Algernon Blair for breach of the subcontract because the dispute should have been submitted to the appeals procedure established in the prime contract for resolution.
 
 
 13
 Hartline-Thomas also claims that the District Court erred in directing a verdict in favor of Algernon Blair on the question whether Hartline-Thomas' termination of performance constituted a material breach of the subcontract. It alleges that Algernon Blair failed to make adequate monthly progress payments and that its withdrawal from the project was therefore not a breach of contract. We affirm the District Court's judgment directing a verdict in favor of Algernon Blair.
 
 
 14
 The standard for determining whether to grant a motion for directed verdict was articulated by this Court: " [W] hether the evidence is such, without weighing the credibility of the witnesses or considering the weight of the evidence, that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made." Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 579 (6th Cir. 1979) (citing Standard Alliance Ind. v. Black Clawson Co., 587 F.2d 813, 823 (6th Cir. 1978), cert. denied, 441 U.S. 923 (1979); Morelock v. NCR Corp., 586 F.2d 1096, 1104 (6th Cir. 1978), (cert. denied, 441 U.S. 906 (1979); Wolfel v. Sanborn, 555 F.2d 583, 593 (6th Cir. 1977), cert. denied, 459 U.S. 1115 (1983)). The Court in Coffy emphasized that "[o]nly when it is clear that reasonable men could come to but one conclusion from the evidence should a court grant a motion for directed verdict." 600 F.2d at 579.
 
 
 15
 The proof at trial established that Hartline-Thomas would have been entitled to a progress payment in the amount of $15,333.76 for the month of February had the subcontractor not withdrawn from the project prior to Algernon Blair's receipt of the government check for that period. Hartline-Thomas claimed it was due $24,087.62. The difference of $8,753.86 consisted of a joint check issued by Algernon Blair to Hartline-Thomas and a company to which Hartline-Thomas owed money, two early payment discounts received by Algernon Blair when it paid Hartline-Thomas' paint bill early, and anticipated Tennessee sales tax.
 
 
 16
 Regarding the joint check, the evidence showed that Algernon Blair had issued a check to Hartline-Thomas in August of 1979 for an unrelated project. The check should have been issued jointly to Hartline-Thomas and Vicrtex, a company to which Hartline-Thomas owed money. It was issued solely to Hartline-Thomas, however, and Hartline-Thomas was unable to pay Vicrtex when the amount came due. Algernon Blair and Hartline-Thomas then agreed that they should demonstrate good faith to Vicrtex and that they would satisfy the amount due to Vicrtex through subsequent joint checks. The check for $7,697.44 was considered a payment to Hartline-Thomas on the Ft. Campbell project. The check was admitted into evidence at trial and was shown to have been endorsed by Hartline-Thomas and deposited into an account of Vicrtex. The District Court held with respect to the joint check that there was "no substantial evidence upon which reasonable men could conclude other than that this $7,697.44 joint check was approved by an authorized representative of Hartline-Thomas and was properly treated as a payment to Hartline-Thomas on the Fort Campbell project." Joint Appendix at 37.
 
 
 17
 The remaining difference of $1,056,42 comprised the early payment discounts of $563.42 and the anticipated sales tax of $493.00. Algernon Blair admitted that the amount withheld for tax was improperly withheld and credited the amount of $493.00 to Hartline-Thomas as an amount due in March of 1981. Regarding the early payment discounts, the District Court stated that it was "inclined to conclude that substantial evidence supports a finding that it was appropriate for Algernon Blair to retain the benefit of the Sherwin-Williams early payment discounts." Joint Appendix at 39. The District Court concluded that:
 
 
 18
 pretermitting a determination with respect to these sums and taking all of the evidence in a light most favorable to Hartline-Thomas, ... there is no substantial evidence in the record from which it could be reasonably concluded that Algernon Blair failed to pay monthly progress payments to Hartline-Thomas as required by the Subcontract or that a failure of payment in the amount of $1,058.42 would, under aH of the facts and circumstances applicable in this case, constitute a material breach of the Subcontract.
 
 
 19
 Id. The Court thus held that "[h] aving reached this determination, it is ... clear that there is no substantial evidence from which reasonable men could conclude that the termination or substantial limitation of performance by Hartline-Thomas of its Subcontract did not constitute a material breach of the Subcontract." Id. at 34.
 
 
 20
 We find that Hartline-Thomas was not entitled to reduce its workforce on the basis of either its dispute over the change order or its claim that Algernon Blair had failed to make adequate progress payments, and that its reduction of the workforce to two painters was a material breach of the subcontract. We affirm the District Court's judgment directing a verdict in favor of Algernon Blair.
 
 
 
 [1]
 The subcontractor's representatives were permitted to attend these meetings
 
 
 [2]
 The general contract provides that the government may change the work to be performed by the general contractor. In addition, the subcontract addresses changes in work and states that "No alterations or changes shall be made, however, except upon written order from contractor, and contractor shan not be held liable to subcontractor for any extra Labor, materials or equipment furnished without such written order." Article IV(a). The subcontract further provides that if the amount to he paid to account for the change cannot be agreed upon, "[they subcontractor shall follow the appeal procedure set up in the General Contract between the Owner and Contractor; but, meanwhile, the work shall proceed as directed." Id. (emphasis added)